IN IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IMPACT AUTOMATION, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-23-3464 |
| MATTHEW A. HAAS, et al., | * | |
| Defendants. | * | |
| | *** | |

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiff Impact Automation, Inc.'s ("Impact") Motion for Summary Judgment (ECF No. 18). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons set forth below, the Court will deny the Motion.

### I.   BACKGROUND

**A.   Factual Background**

Defendant Matthew A. Haas began working for Impact, a material handling business, on September 6, 2022. (Compl. ¶ 1, ECF No. 1). Haas served as Impact's Installation Manager. (Haas Dep. 58:11–13, ECF No. 18-5). Haas's duties included quoting and awarding jobs to subcontractors, ensuring timely completion of projects, and overseeing the final execution of projects. (Id. at 58:14–21; Haas Resume at 1, ECF No. 18-7). Additionally, Haas worked on Impact's automated divert to aisle ("ADTA") technology. (Wargo Dep. 22:5–14, ECF No. 18-4). ADTA technology involves

"singulating, gapping, scanning packages, and then sorting them for the final mile delivery operation. [I]t's an automated process that would singulate, gap, scan, and sort products, over 5,000 parcels an hour." (Id. at 22:5–10). Impact created parts of this technology specifically for Amazon, one of its clients. (Id. at 22:12–14). The ADTA technology that Impact created and provided to Amazon was unique to Impact. (Id. at 26:14–20). Before ADTA technology, companies like Impact used "mechlight" technology, which is a "power roller conveyer" that is "very labor intensive." (Haas Dep. 63:9–12).

Impact sent Haas an offer letter on August 17, 2022. (Id. at 63:18–20; Sept. 30, 2022 Email Chain at 1, ECF No. 18-8).[1] The offer letter provides that Haas would be subject to a "Intellectual Property Confidentiality Non-compete and Non-solicitation Agreement." (Haas Dep. 64:1–5). Haas took issue with several provisions of the non-compete and sent an email to Impact with the subject of "employment agreement concerns." (Sept. 30, 2022 Email Chain at 2–4, ECF No. 18-8). After several email exchanges and a phone call between Haas and Impact, in which Haas negotiated several terms of the agreement, Haas signed and emailed a revised copy of the non-compete back to Impact on September 30, 2022. (Sept. 30, 2022 Email Chain at 1). The executed non-compete provides as follows:

> Impact is engaged in the business of designing, manufacturing, marketing, servicing, and selling conveyor systems and factory automation. During the term of my employment with lmpact, I will not undertake any activities (side work) that are directly or indirectly competitive with Impact's business as set forth in this paragraph.

---

[1] Citations to the page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system. Otherwise, the page numbers refer to those found on the original documents filed with the Court.

> For a period of one year from the voluntary or involuntary termination of my employment with Impact, I will not directly or indirectly solicit, agree to supply products, or perform services which are similar to those distributed, sold, or provided by Impact to the Impact customer base (end users).

(Impact Non-compete Agreement ["Non-compete"] at 2, ECF No. 18-9). Despite high expectations, soon after Haas began at Impact, he felt dissatisfied with his job because he did not have enough responsibilities. (Joice Dep. 27:5–7; 29:2–19, ECF No. 18-3). In Haas's view, things were "[v]ery slow at first" because there were "very few phone calls, very few meetings, [and] very little direction." (Haas Dep. 71:2–9). That is when LEWCO, a material handling business at the center of this dispute, enters the picture. In January and March of 2023, LEWCO's Director of Field Services, Collin Straus, asked Haas to Join LEWCO. (Id. at 101:1–21-102:1–10). At first, Haas declined joining LEWCO, but by early April, Haas was ready to move on. (Id. at 104:10). Haas visited LEWCO in Port Clinton, Ohio to tour the facility. (Id. at 104:17–21). At the visit, Haas disclosed that he was subject to Impact's non-compete. (Id. at 106:16–19).

LEWCO formally offered Haas a job on May 30, 2023. (LEWCO Job Offer at 1–2, ECF No. 18-13). Before signing the offer letter, Haas consulted with Impact to see whether it would release him from the non-compete. (Haas Dep. 116:11–12; 117:9–17). Haas's goal was to walk away from Impact with a "clean release" from the non-compete. (Id. at 117:13). Impact's leadership met with Haas and listened to his concerns with the goal of retaining him, and ultimately redrafted his job description to give him a new role with increased pay and responsibilities. (Joice Dep. 26:19–27:1–3; June 3, 2023 Email Thread at 1, ECF No. 18-15; June 12, 2023 Email Thread at 1–3, ECF No. 18-16). Despite these

efforts, Haas submitted his resignation letter to Impact on July 5, 2023, with an effective end date of July 13, 2023. (July 5, 2023 Resignation Letter, ECF No. 18-19). Although Haas asked Impact to release him from its non-compete, Impact refused this request. (Haas Dep. 119:8–13). During his exit interview on July 5, 2023, Joe Joice, President of Impact, reminded Haas that Impact did not release him from its non-compete. (Joice Dep. 24:4–11).

Haas provided LEWCO a copy of Impact's non-compete agreement on June 23, 2023. (Haas Dep. 125:15–21). LEWCO agreed to indemnify Haas if Impact decided to enforce its non-compete. (Id. at 127:4–8). Haas was again subject to a non-compete, this time with LEWCO. (LEWCO Non-compete at 1, ECF No. 18-20).

Haas began working for LEWCO in July 2023. (July 5, 2023 Offer Letter, ECF No. 18-18). Impact sent notice to LEWCO and Haas that Haas was in violation of Impact's non-compete and advised that Haas should be removed from all Amazon work immediately. (Haas Dep. 138:9–139:1-16; Aug. 7, 2023 Email Thread at 1–2, ECF No. 18-21). LEWCO advised that it removed Haas from Amazon work on September 29, 2023. (Sept. 29, 2023 Email thread, ECF No. 18-26).

**B.    Procedural History**

On December 21, 2023, Impact filed a lawsuit against LEWCO and Haas ("Defendants"). (ECF No. 1). The two-count Complaint alleges: breach of contract (Count I) and tortious interference with contractual relationship (Count II). (Compl. at 5–8, ECF No. 1). On March 1, 2024, Defendants answered the Complaint. (ECF No. 6). On August 13, 2024, Impact filed the instant Motion for Summary Judgment. (ECF No. 18). Impact

seeks summary judgment on all counts. (Id.). Defendants filed an Opposition on August 27, 2024. (ECF No. 21). On September 11, 2024, Impact filed a Reply. (ECF No. 24).

## II.   DISCUSSION

### A.  Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence." Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140

(4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 247–48; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**B. Analysis**

Impact seeks summary judgment on its breach of contract claim (Count I) and its tortious interference claim (Count II). At bottom, the Court will deny summary judgment on both claims.

    **1.    Non-competition Provision**

Defendants assert Impact is not entitled to summary judgment on its breach of contract claim because the non-competition provisions in Haas's employment agreement are not enforceable. (See Defs.' Opp'n Mot. Summ. J. at 19–24, ECF No. 21). Specifically,

6

Defendants maintain these provisions are wider in scope than is reasonably necessary to protect Impact's business. (Id.). Defendants further argue the non-competition provisions impose an undue hardship and violate public policy. (Id. at 23–25). The Court will address these arguments in turn.

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." Taylor v. NationsBank, N.A., 776 A.2d 645, 651 (Md. 2001). Thus, if the restrictive covenants in the Agreement are unenforceable, Impact's claims would fail as a matter of law because there is no contractual obligation.

Under Maryland law,[2] whether a restrictive covenant is enforceable depends upon the unique language of the covenant at issue, Holloway v. Faw, Casson & Co., 572 A.2d 510, 515 (Md. 1990), and the specific facts of the case. Ruhl v. F.A. Bartlett Tree Expert Co., 225 A.2d 288, 291 (Md. 1967). To be enforceable, a restrictive covenant must satisfy the following four requirements: "(1) the employer must have a legally protected interest"; "(2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest"; "(3) the covenant cannot impose an undue hardship on the employee"; and "(4) the covenant cannot violate public policy." Deutsche Post Glob. Mail, Ltd. v. Conrad, 116 F.App'x 435, 438 (4th Cir. 2004).

---

[2] The parties do not dispute that Maryland law applies to these claims.

### a. Legally Protected Interest

Defendants contend that Impact fails to meet the first element of an enforceable restrictive covenant because Impact has no legally protected interest. (Opp'n at 20). The Court disagrees. Restrictive covenants are enforced when the employee at issue possesses unique, specialized skills or knowledge. Ecology Servs. v. Clym Env't Servs. LLC, 952 A.2d 999, 1009 (Md. 2008) (citing Rosenstein v. Zentz, 85 A. 675 (Md. 1912)). A "unique or specialized skill held by an employee, by virtue of knowledge, ability, or reputation, is one that would make it difficult to find a substitute employee." Id.

Here, Defendants "do not dispute that Impact invented its unique hardware and software" which "includes sophisticated singulator and gapping technology." (Opp'n at 10). It is also undisputed that Impact trained Haas on its unique ADTA technology, which would make it more difficult for Impact find a substitute employee. (Id. at 12). Haas's resume reflects proficiency in installation projects, particularly for Amazon. (Haas Resume at 1). The Court finds training in ADTA technology sufficiently qualifies as a "unique" and "specialized skill." Cf Ecology Servs., 952 A.2d at 1009–11 (finding employee did not possess unique or specialized skill because it would not be difficult for the employer to find a replacement for said employee). Accordingly, the Court finds that Impact has a legally protected interest.

### b. Unreasonable Scope and Duration

Defendants next argue the provision's scope is unenforceable because it is "designed to prevent any kind of competition." (Opp'n at 23). The Court agrees. "Construction of a contract is, in the first instance, a question of law for the court to

resolve." Shapiro v. Massengill, 661 A.2d 202, 208 (Md.Ct.Spec.App. 1995) (citing Suburban Hosp. v. Dwiggins, 596 A.2d 1069, 1075 (Md. 1991)). Maryland follows the objective law of contracts. Gen. Motors Acceptance Corp. v. Daniels, 492 A.2d 1306, 1310 (Md. 1985). Consequently, where the language of the non-competition provision is plain and unambiguous, the Court will presume the parties meant what they expressed. See id. A written contract is unambiguous if, when read by a reasonably prudent person, it is not susceptible to more than one meaning. See Calomiris v. Woods, 727 A.2d 358, 363 (Md. 1999).

Here, Impact's non-compete is only for one year, which is less than the widely accepted minimum standard in Maryland. See, e.g., Holloway, 572 A.2d at 522 (three years). The provision's scope, however, appears to prohibit Haas from performing similar installations services with any company, not just Impact's end users. See SNS One, Inc. v. Hage, 2011 WL 2746713, at *3-4 (D.Md. Jul. 11, 2011) (holding that a covenant was overly broad because it contained no limitations on the types of competitors it applied to, and the company did not set forth specific facts to support its position that an industry-wide restriction was necessary). Specifically, the non-compete provides that for one year after Haas leaves Impact, he "will not directly or indirectly solicit, agree to supply products, or perform services which are similar to those distributed, sold, or provided by Impact to the Impact customer base (end users)." (Impact Non-compete at 2). Defendants assert this is "essentially an industry-wide restriction." (Opp'n at 23). Both the language of the non-compete and the case law supports Defendants' view. See Blue Ridge Risk Partners, LLC v. Willem, 724 F. Supp. 3d 398, 406 (D.Md. 2024) (finding non-compete provision

9

unreasonable in scope as it prevents Defendant from "'[s]olicit[ing], attempt[ing] to obtain, accept[ing] or in any manner transact[ing] insurance business with, from, or on behalf of any of the Clients of the Agency,' which include 'each and every person, firm, company or organization who or which is a customer of or account on the books.'"); Seneca One Fin., Inc. v. Bloshuk, 214 F.Supp.3d 457, 463 (D.Md. 2016) (concluding that a noncompete provision barring employee from engaging in the "same or similar [b]usiness" was overbroad because it was not properly tailored to the work the employee performed for the employer). Impact insists the non-compete only prohibits Haas from performing ADTA-system related work for Amazon or USPS. (Mot. at 25). But, as Defendants note, the "non-compete, as written, is not limited to ADTA work or to Amazon." (Opp'n at 24). Viewing the evidence in the light most favorable to Defendants, as this Court must, DeStefano, 557 U.S. at 586, the non-compete provision extends beyond those narrow confines. Accordingly, the Court finds the non-compete unreasonable in scope.[3]

---

[3] If a restrictive covenant is unnecessarily broad, a court may blue pencil or excise language to reduce the covenant's reach to reasonable limits." Deutsche Post Global Mail, Ltd. v. Conrad, 116 F.App'x. 435, 438 (4th Cir. 2004). However, "[a] court [may] only blue pencil a restrictive covenant if the offending provision is neatly severable. Although offending provision[s] may be stricken, Maryland courts have excised restrictions that render a covenant overbroad only in circumstances in which the restrictions are contained in a separate clause or separate sentence." Ameritox, Ltd. v. Savelich, 92 F. Supp. 3d 389, 400 (D.Md. 2015) (cleaned up). This principle is not applicable to the contract in this case because the offending provision of the non-compete is not neatly severable.

### c. Undue Hardship and Public Policy

The provisions at issue also impose an undue hardship on Defendants. A non-competition provision does not impose undue hardship when an employee is permitted to undertake similar work. Intelus Corp. v. Barton, 7 F.Supp.2d 635, 642 (D.Md. 1998).

Here, the provision is vague as to whether it permits Haas to employ his skills and talents as an Installation Manager in his field. (Impact Non-compete at 2). Courts look skeptically at provisions that could arguably prohibit an employee from remaining in his industry. Cf Willem, 724 F.Supp.3d at 404 (explaining provision does not impose undue hardship where Plaintiff "may continue to work in the [same] industry"). Because all four elements of a legally enforceable non-compete have not been met, the Court need not address the issue of breach. Accordingly, the Court will deny summary judgment as to Count I.

### 2. Tortious Interference

Impact has also moved for summary judgment on its tortious interference with a contract claim against LEWCO (Count II). (Mot. at 33). Defendants assert Impact is not entitled to summary judgment on this claim because Impact has failed to establish the required element of damages. (Opp'n at 25-26). The Court agrees with Defendants for the reasons set forth below.

The elements of tortious interference with contract under Maryland law are:

> (1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff.

Fowler v. Printers II, Inc., 598 A.2d 794, 802 (Md.Ct.Spec.App. 1991) (cleaned up). "The tort . . . is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship." Macklin v. Robert Logan Assocs., 639 A.2d 112, 117 (Md. 1994). See also Sharrow v. State Farm Mut. Auto. Ins. Co., 511 A.2d 492, 497 (Md. 1986) ("[T]he tort may arise where intentional interference by a third party with another in his business or occupation induces a breach of an existing contract."); Natural Design, Inc. v. Rouse Co., 485 A.2d 663, 674 (Md. 1984) ("[T]he two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, malicious or wrongfully interfering with economic relationships in the absence of a breach of contract.").

LEWCO disputes the fifth element of damages. (Opp'n at 27). In order to prevail on this element, a plaintiff must generate some evidence proving that the tortious conduct proximately caused business loss. "If evidence points to two or more equally possible causes for the business loss, and the defendant is responsible for only one, the claim fails as a matter of law. Causation evidence that is wholly speculative is not sufficient." Skapinetz v. CoesterVMS.com, Inc., No. PX-17-1098, 2019 WL 2579120, at *7 (D.Md. June 24, 2019) (internal quotation marks omitted). Impact claims that because of LEWCO's interference, it has suffered:

- Replacement Employee Training Expenses: $6,446.48
- Manager Expenses to Train New Hire: $2,714.99
- Losses Due to Employees Substituting for Haas: $540,000
- Lost Profits Due to Loss of Business with Amazon: $1,920,000
- Attorney's fees of $118,183.65; costs of $5,035.56

(Mot. at 33). When asked to explain how Impact arrived at these figures, particularly for its lost profits estimate, Joe Joice testified that the figure was:

> based on what each employee would contribute as part of that on a monthly basis. So using the aggregate of the number of fingers that we had times the value of a finger and then applied that as a individual's contribution to revenue that's being generated and then multiplied that by three months of lost revenue based on not having that employee.
>
> Q: What documents did you rely upon to calculate these losses?
>
> A: So to be conservative, we -- we used some of the information that was obtained during the deposition with Ms. Martucci, and we used a finger of value of $1.2 million. Each finger varies in price, but again, we used a 1.2 number. We assumed that there was a 10 percent margin associated with that, and -- and we applied that essentially across the board when we were doing our calculations.
>
> Q: The 1.2 number came from Emily Martucci's deposition?
>
> A: Yes.

(Joice Dep. 69:7–22; 70:1–8). Defendants maintain that these damages are "highly speculative," and that Impact would have lost business whether or not Haas left because Amazon had less overall work to award in 2023. (Opp'n at 27; Martucci Dep. 63:2–4). Defendants further contend "the only 'facts' in the record to support Impact's calculation of damages for the loss of [work] in this matter are actually arbitrary assumptions drawn from a rough estimation of the revenue LEWCO receives . . . and not any evidence of Impact's past profits." (Opp'n at 18). Impact counters that lost profits need not be demonstrated with absolute certainty, and that it has produced a "lowballed figure" and

"conservatively estimated" its damages. (Mot. at 34; Pl.'s Reply Supp. Mot. Summ. J. at 8, ECF No. 24). LEWCO disputes the assumptions inherent in Impact's damages calculation. (Opp'n at 27–28).

At bottom, the Court agrees with Defendants that the damages posited by Impact are speculative; therefore, summary judgment is not appropriate on this basis. See Davis v. Zahradnick, 600 F.2d 458, 460 (4th Cir. 1979) (holding that summary judgment is not appropriate if the resolution of material issues depends upon credibility determinations). Accordingly, the Court will deny summary judgment as to Count II.

### III.   CONCLUSION

For the foregoing reasons, the Court will deny Impact's Motion for Summary Judgment (ECF No. 18). A separate Order follows.

Entered this 25th day of February, 2025.

/s/
George L. Russell, III
Chief United States District Judge